**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JON WALSH, | ) | CASE NO: 3:15CV1708 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | | |

Plaintiff, Jon Walsh ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

his applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"),

and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security

Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This case is before the undersigned

United States Magistrate Judge pursuant to the consent of the parties entered under the

authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's

final decision is VACATED and the case REMANDED for further proceedings consistent

with this opinion.

## I.    PROCEDURAL HISTORY

In December 2011, Plaintiff filed his applications for POD, DIB, and SSI, alleging

a disability onset date of September 28, 2011.  (Transcript ("Tr.") 33.)  The claims were

denied initially and upon reconsideration, and Plaintiff requested a hearing before an

administrative law judge ("ALJ").  (*Id.*)  On November 15, 2013, an ALJ held Plaintiff's

hearing.  (*Id.*)  Plaintiff participated in the hearing, was represented by an attorney,[1] and testified.  (*Id.*)  A vocational expert ("VE") also participated and testified.  (*Id.*)  On January 3, 2014, the ALJ found Plaintiff not disabled.  (Tr. 33-44.)  On June 26, 2015, the Appeals Council denied review, and the ALJ's decision became the Commissioner's final decision.[2]  (Tr. 1-3.)

On August 25, 2015, Plaintiff filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12, 15, 16.)

Plaintiff asserts the following assignments of error:

(1) The ALJ erred in failing to mention, let alone address, opinion evidence from the treating psychiatrist (GAF rating) or from the treating therapist, where these opinions documented greater limitation on Mr. Walsh's ability to work;

(2) The ALJ's finding of residual functional capacity is not supported by substantial evidence where even the opinion evidence upon which the ALJ claimed to rely documents greater impairment on Mr. Walsh's ability to function in the workplace; and

(3) The ALJ's finding of residual functional capacity is not supported by substantial evidence where she failed to address with any specificity the

---

[1]The ALJ decision states that a "non-attorney representative" appeared on Plaintiff's behalf at the hearing.  (Tr. 33.)  The hearing transcript, however, indicates that Plaintiff was represented by counsel.  (Tr. 57.)

[2] After the ALJ issued his decision on January 3, 2014, Plaintiff requested review by the Appeals Council and requested an extension of time to file a supporting memorandum.  (Tr. 24.)  It appears the Appeals Council issued a Notice on April 8, 2015 denying review before offering Plaintiff additional time to review the record.  (Tr. 13.)  Plaintiff, through counsel, then filed a Motion to Vacate the Appeals' Council April 8, 2015 Notice.  (Tr. 376-377.)  The Appeals Council granted the motion and allowed Plaintiff to file a supporting memorandum.  (Tr. 6, 385-390.)  The Appeals Council thereafter denied review on June 26, 2015. (Tr. 1.)

2

statements of family members and these statements are consistent with the treatment record.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born in July 1965 and was 46-years-old on the alleged disability onset date.  (Tr. 42.)  He had at least a high school education and was able to communicate in English.  (*Id.*)  He had past relevant work as a cashier, sales person, and merchandise deliverer.  (*Id.*)

### B.    Medical Evidence

#### 1.    Medical Reports

Plaintiff has a long history of mental illness.  On March 30, 2010, he was admitted to the Psychiatric Unit of Firelands Regional Medical Center ("Firelands") for inpatient treatment.  (Tr. 391-393.)  Physician Carlos Lowell, D.O., explained Plaintiff's history and presentation as follows:

> The patient is a 44-year-old married, white male well known to me with a long history of bipolar disorder, currently a manic type with psychotic features.  The patient developed a progressive mild renal insufficiency due to his lithium.  Earlier this winter, it was decided to decrease the lithium carbonate to see if this would provide some improvement of renal functioning.  The patient's mild renal insufficiency did not resolve and the patient became progressively more manic in spite of increasing his Navane dosing.  Over the week prior to admission the patient's mania essentially became out of control becoming blatantly psychotic, bizarre, agitated, and slapping his wife.  Due to inability to stabilize the situation on an outpatient basis and obviously needing to discontinue lithium, it was decided to admit the patient . . . and do a rather rapid cross titration of lithium and Trileptal, as well as utilizing p.r.n. medications. . .  Thought process was disorganized and paranoia was seen and grandiosity significantly worsened.

(Tr. 391.)

3

Dr. Lowell diagnosed bipolar disorder, manic phase, severe with psychotic features; and mild renal insufficiency due to lithium carbonate.  (Tr. 393.)  Over the course of Plaintiff's three day hospitalization, his mania, thought process, irritability, and agitation progressively improved.  (Tr. 392.)  He was discharged home on April 2, 2010, with prescriptions for Trileptal, Cogentin, and Navane.  (*Id.*)  Dr.Lowell assessed a Global Assessment of Functioning ("GAF") of 45 at the time of discharge, indicating serious symptoms.[3]

Eight months later, on December 9, 2010, Plaintiff was again admitted to Firelands for inpatient psychiatric care after he stopped taking his medication.  (Tr. 395-396.)  He was evaluated by Dr. Lowell, who noted Plaintiff's "psychosis [has] markedly worsened to the point of believing the mafia is out to kill him."  (Tr. 395.)  Dr. Lowell found Plaintiff "demonstrated classic mixed phase, at times crying, tearful, hopeless, . . . suicidal[,] . . . expansive and grandiose."  (*Id.*)

Plaintiff was admitted to the general psych unit and placed on suicide precautions.  (*Id.*)  His home medications were restarted, after which his "psychosis and affective instability significantly improved."  (*Id.*)  Dr. Lowell diagnosed bipolar disorder, mixed phase, severe with psychotic features, and noted noncompliance with treatment.  (Tr. 396.)  He assessed a GAF of 45 at the time of discharge on December 14, 2010,

_____

[3] The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

4

indicating serious symptoms.  (*Id.*)

In June 2011, licensed social worker Barbara Banchich, LSW, performed a mental health assessment.  (Tr. 431-433.)  Plaintiff reported a long history of depression and anxiety and stated he had been diagnosed with bipolar disorder since 1992.  (Tr. 431.)  He reported a good relationship with his family, "lots of friends," and enjoying the outdoors and singing karaoke.  (*Id.*)  Plaintiff stated he had "lost his job because a coworker had made death threats against him."  (Tr. 432.)  On mental status examination, Ms. Banchich noted anxiety and mild depression.  (*Id.*)  Ms. Banchich diagnosed bipolar disorder, most recent episode mixed, as evidenced by anxiety, mood swings, and depression.  (Tr. 433.)  She assessed a GAF of 48, and referred Plaintiff to individual and group counseling.  (Tr. 432-433.)

Thereafter, between August and December 2011, Plaintiff had four individual counseling sessions with Annette Laird, Professional Counselor ("PC").  (Tr. 443, 445, 447, 449.)  Throughout this time period, Plaintiff talked repeatedly about his financial problems, arguments with his family, and his deteriorating relationship with his wife.  (*Id.*)  In August 2011, Ms. Laird noted a labile affect and tangential thought processes.  (Tr. 449.)  The following month, she observed "bizarre and delusional paranoid cognitive thought processes" and "attempted to facilitate reality testing to help [Plaintiff] become aware of his psychotic state."  (Tr. 447.)  During this visit, Plaintiff voiced paranoia, claiming "everybody is against" him and "people are making 'death threats' against him b/c they don't want his help."  (*Id.*)  He "talked about how one of his ex-[girlfriends] had 'sliced [him]' in the side and drew blood; how he's working to 'divide the evil from the good,' [and] was working to make biblical and religious connections with 'red, white, and

5

blue." (*Id.*)  Plaintiff also reported that "people are telling [him] to 'shoot [his wife]' as he began to cry and indicate how he's been 'picked on.'" (*Id.*)  Ms. Laird assessed euthymic mood, religious preoccupations, grandiosity, bizarre and disorganized cognitive processes, and delusional and psychotic behavior.  (*Id.*)

In November 2011, Plaintiff exhibited psychomotor activity and hypomanic behaviors.  (Tr. 445.)  He reported feeling "speeded up and hyper" but stated his medications helped "bring him down."  (*Id.*)  Plaintiff expressed an interest in finding employment, and Ms. Laird referred him to community psychiatric supportive treatment ("CPST") for assistance.  (*Id.*)  She continued to "monitor [him] for psychotic symptoms as this has been an ongoing problem."  (*Id.*)

In December 2011, Ms. Laird noted conversations with Plaintiff's family regarding their concerns about his mental health. (Tr. 443.)  She remarked that Plaintiff's self-assessments were "contradictory to what his family is reporting."  (*Id.*)  Plaintiff requested, and received, a referral to the Supported Employment Preparation and Linkage Services ("SEPAL") program for assistance in finding employment.  (*Id.*)  Ms. Laird noted labile affect and cooperative, but restless, behavior.  (*Id.*)

In December 2011 and January 2012, CPST worker Vincent Nimrichter, Qualified Mental Health Specialist ("QMHS") met with Plaintiff and had several conversations with family members regarding his mental health status.  (Tr. 551, 550, 549, 547, 544, 542, 541.)  At one appointment, Plaintiff wore stained clothes and slippers and was "very manic" at the beginning of the session.  (Tr. 542.)  Plaintiff asked Mr. Nimrichter for money, in response to which Mr. Nimrichter explained it was an inappropriate question. (*Id.*)  Several weeks later, Plaintiff reported to Mr. Nimrichter that he had an incident

6

with a female gym instructor which led to the police being called and charges filed in state court.  (Tr. 537.)  Plaintiff insisted it was a "misunderstanding and he was innocent."  (*Id.*)  Mr. Nimrichter noted Plaintiff "appeared to have no personal insight on how other people may view some things he says."  (*Id.*)  Later, Mr. Nimrichter assisted Plaintiff in resolving a utility shut-off notice and observed that Plaintiff "made some inappropriate comments to a front desk worker."  (Tr. 534.)  He noted Plaintiff "could use some tact and social skills" training.  (*Id.*)

 Plaintiff returned to Ms. Laird on January 27, 2012.  (Tr. 532.)  Ms. Laird stated Plaintiff "is not realistic as he continues to struggle with mental health symptoms he is unaware of."  (*Id.*)  Plaintiff's thoughts were often tangential and derailed; he exhibited difficulty staying focused and attentive; and his hygiene was poor.  (*Id.*)  Ms. Laird worked with Plaintiff regarding "how to appropriately present himself in public in an effort to minimize impulsive and inappropriate social behaviors."  (*Id.*)

 On February 6, 2012, Plaintiff began treatment with psychiatrist Gregory Bishop, M.D.  (Tr. 494.)  Plaintiff denied psychotic symptoms, but complained of feeling hyper, irritable, impulsive, intrusive and "causing problems with people he knows."  (*Id.*)  On examination, Dr. Bishop noted the following:

> His grooming is decreased.  His affect is odd, inappropriate and somewhat
> elevated. He is not depressed.  He denies suicidal ideation or homicidal
> ideation. Speech pattern is a bit rapid, but not pressured.  His thoughts are
> circumstantial and tangential.  He is oriented x 3, however, his insight and
> judgment are decreased.  Behavior control is adequate.  No evidence of
> hallucinations [or] delusions.

(Tr. 494.)  Dr. Bishop diagnosed bipolar affective disorder, currently manic state; and

7

assessed a current GAF of 40.[4]  (Tr. 495.)  He also noted that Plaintiff's highest GAF level in the past year was 50, indicating serious symptoms.  (*Id.*)  Dr. Bishop prescribed Geodon; continued Plaintiff on Trileptal, Navane, Ativan, and Cogentin; and encouraged him to continue individual counseling.  (Tr. 495-496.)

Plaintiff returned to Ms. Laird and Mr. Nimrichter in February 2012.  (Tr. 527-528.)  He reported "great improvement" and feeling calmer.  (*Id.*)  Both counselors, however, noted continuing mental health symptoms, including tangential and racing thoughts, erratic conversation, difficulty with cognitive skills, and labile affect.  (*Id.*)  Plaintiff reported working with his job coach to find steady employment.  (*Id.*)  The following month, Plaintiff stated he felt "on top of the world" because he found part-time work at a local greenhouse.  (Tr. 523.)

Plaintiff returned to Dr. Bishop in March and April 2012.  (Tr. 489, 486.)  He continued to report improvement and feeling "much better."  (Tr. 489.)  Dr. Bishop noted good grooming and no evidence of psychotic or manic symptoms, but observed circumstantial thoughts and elevated and inappropriate affect.  (Tr. 489, 486.)  Dr. Bishop adjusted Plaintiff's medications.  (*Id.*)  During this time period, Plaintiff's family continued to report "concerns about things [Plaintiff] says and does," including selling his father's truck without permission and trying to purchase vehicles without the financial means to do so.  (Tr. 525.)  Mr. Nimrichter also noted Plaintiff "talked about another incident he had at Circle K," during which he offended someone and the police were

---

[4]  A GAF score of 31 to 40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.

called.  (Tr. 522.)  Mr. Nimrichter advised him "not to speak to strangers in general."  (*Id.*)

In May 2012, Plaintiff exhibited euphoric affect and rapid speech "with some evidence of mania."  (Tr. 485.)  The following month, he reported quitting his job but "did not want to talk about the situation."  (Tr. 516.)  On June 15, 2012, Dr. Bishop noted Plaintiff was anxious, mildly paranoid, and reporting auditory hallucinations.  (Tr. 515.)  He continued Plaintiff on Geodon, Trileptal, Cogentin, and Lorazepam.  (*Id.*)  Plaintiff presented to Ms. Laird in July 2012 and expressed sadness that he and his wife were divorcing.  (Tr. 513.)  Plaintiff reported feeling stable, but Ms. Laird noted pressured and inappropriate laughter throughout the session.  (*Id.*)

On July 24, 2012, Ms. Laird completed a Daily Activities Questionnaire.  (Tr. 478-479.)  She found Plaintiff had "poor insight about how to adequately cope with and manage mental health symptoms," and had shown "a pattern of not being aware of symptomatology especially when manic."  (Tr. 478.)  Ms. Laird also noted Plaintiff was independent in the areas of food preparation, household chores, personal hygiene, shopping, and driving, but entirely dependent on his family for banking and bill paying.  (Tr. 479.)

Plaintiff thereafter reported he was "tired of women and wanted a man therapist."  (Tr. 511.)  He began treatment with Kenneth Wolford, PCC, on August 8, 2012.  (Tr. 510.)  At that time, Plaintiff identified his main stressors as his finances and his "broken relationship" with his wife.  (*Id.*)  He described his symptoms as stable and his mood as "improving."  (*Id.*)  Mr. Wolford noted an appropriate affect and "agreed to help [Plaintiff] work on his social skills."  (*Id.*)  Plaintiff returned to Mr. Wolford in October 2012, at

9

which time Mr. Wolford reported similar findings.  (Tr. 506.)

Meanwhile, in a visit with Dr. Bishop on September 10, 2012, Plaintiff reported "some degree of anxiety and frustration" but "fairly well controlled" bipolar symptoms. (Tr.  508.)  Dr. Bishop noted Plaintiff's "affect appears to be moderately anxious and mildly depressed, but this appears to be related to current stressors at his new job." (*Id.*)  He observed no psychotic symptoms and found Plaintiff's "thoughts are somewhat circumstantial but less tangential."  (*Id.*)  In December 2012, Plaintiff reported being recently fired from his job.  (Tr. 502.)

Plaintiff returned to Dr. Bishop in April and July 2013.  (Tr. 574, 561-562.)  In April, Plaintiff reported feeling "okay," but complained of stress and anxiety relating to his financial troubles.  (Tr. 574.)  Dr. Bishop assessed a moderately anxious, mildly depressed affect and circumstantial thoughts, but no psychotic symptoms.  (*Id.*)  In July, Plaintiff reported worsening symptoms, including mood swings, anxiety, paranoia, depression, and irritability.  (Tr. 561.)  On examination, Dr. Bishop noted an inappropriate and labile affect; circumstantial and tangential thoughts with "some degree of flight of ideas;" paranoid ideation; and decreased insight and judgment.  (*Id.*) He noted "most of [Plaintiff's] paranoia seems to revolve around neighbors and also feeling people may be breaking into his house or harassing him."  (*Id.*)  Dr. Bishop ordered a trial of Fanapt, in addition to continuing Plaintiff's prescriptions for Geodon, Trileptal, Cogentin, and Lorazepam.  (Tr. 562.)

Plaintiff saw Mr. Wolford on nine occasions in 2013.  (Tr. 501, 578, 569, 568, 565, 563, 559, 555, 552.)  During these visits, Plaintiff frequently expressed frustration, anxiety, and/or sadness regarding his divorce, his financial situation, and conflicts with

family and neighbors.[5]  (*Id.*)  He spoke often about his problems sustaining employment. (*Id.*)  For example, in May 2013, Plaintiff "talked about the reasons he has lost most of his jobs."  (Tr. 568.)  Mr. Wolford "encouraged client to try harder as the examples he gave made it clear that he does not handle his irritation well at work and tends to say things that led to being fired."  (*Id.*)  In June, Mr. Wolford "role played abuse versus constructive criticism by an employer" and "normalized the idea that bosses some times are in a bad mood."  (Tr. 565.)  Nonetheless, Plaintiff reported problems at work the following month, stating "it is always difficult for him to fit in."  (Tr. 563.)  In August, Plaintiff "admitted that due to his own feelings of inferiority, . . . he tends to view younger bosses in a negative way or feel that they are abusing their authority."  (Tr. 559.)  Mr. Wolford "discussed and role played ways he could better voice his frustrations at work." (*Id.*)  Plaintiff reported losing his job in September 2013.  (Tr. 555.)  In October, he reported "feel[ing] that everyone is against him."[6]  (Tr. 552.)

─────────────────

[5] Plaintiff also reported continuing legal problems relating to his manic behavior. Specifically, in February 2013, he sought assistance relating to a court date for repossession of a car that he purchased as part of a "manic shopping phase." (Tr. 582-583.)

[6] During this time period, Plaintiff frequently presented to registered nurse John McDonough, R.N., to obtain medication from a patient assistance program.  (Tr. 579, 576, 572, 571, 567, 566, 564, 560.)  Mr. McDonough documented Plaintiff's mood and affect during these numerous visits.  (*Id.*)  The record reflects great variation in Plaintiff's presentation.  In February 2013, Plaintiff was calm with a stable mood.  (Tr. 579.) The next month, he was irritable and depressed with a variable and constricted affect.  (Tr. 576.)  In April, Mr. McDonough observed labile affect, noting irritability one moment and euphoria the next.  (Tr. 571, 572.) Plaintiff was calm with a constricted affect in May, but slightly euphoric in June. (Tr. 566, 567.)  Mr. McDonough described Plaintiff as having a stable mood, intact thought process, and bright affect in July 2013.  (Tr. 560.)

2.      **Agency Reports**

On March 7, 2012, Plaintiff underwent a psychological consultative examination with Wayne Morse, Ph.D.  (Tr. 452-459.)  At Plaintiff's request, his brother and brother-in-law were present during the examination.  (Tr. 452.)  Plaintiff reported symptoms of bipolar disorder and treatment with counseling and medication.  (Tr. 454-455.)  He stated that, beginning at age 16, he had been hospitalized eight or nine times, with each hospitalization lasting three to five days.  (Tr. 454.)  He reported having "a lot of aggravations and not as much patience as I used to."  (Tr. 452.)  He acknowledged marital problems and significant difficulties maintaining employment, including being fired on several occasions for inappropriate behavior towards customers and supervisors.  (Tr. 454.)

On examination, Dr. Morse noted that Plaintiff was "cooperative with the interview process" and "made good eye contact with the evaluator."  (Tr. 455.)  Although Plaintiff's speech was tangential, circumstantial and hyperverbal, Dr. Morse found Plaintiff was "easily redirected" and "had no difficulty expressing his thoughts in an organized manner."  (*Id.*)  Plaintiff's overall mood was depressed "with a broad and appropriate affect."  (*Id.*)  He was tearful when discussing his mental health functioning. (*Id.*)  Dr. Morse noted "the claimant reported and exhibited paranoid delusions which were corroborated by his brother and brother-in-law."  (*Id.*)

Dr. Morse found that "overall, the claimant's mental status was fairly good."  (Tr. 456.)  He was alert and oriented and Dr. Morse estimated Plaintiff's cognitive functioning was in the Low Average Range.  (*Id.*)  Dr. Morse concluded, however, that Plaintiff's insight and judgment were poor, explaining as follows:

12

> [Plaintiff] did not report any difficulty controlling his impulses but collateral
> information indicated that he has great difficulty controlling his anger and
> interacting appropriately with others, especially women.  He is unable to
> make sound, reasonable, and responsible decisions.  He has very limited
> social and self-awareness, and is unable to plan for the future.

(*Id.*)  He concluded Plaintiff's prognosis was "poor," explaining that "[a]lthough he is

involved in mental health treatment and taking psychotropic medication, his symptoms

have not improved significantly."  (Tr. 457.)

Dr. Morse diagnosed bipolar I disorder, most recent episode manic, severe with

mood congruent psychotic features; adjustment disorder with anxiety; and antisocial

personality disorder traits.  (Tr. 456.)  He assessed a GAF of 55, indicating moderate

symptoms.  (*Id.*)  In terms of Plaintiff's functional limitations, Dr. Morse opined "there

was no evidence to suggest that the claimant would have any difficulty remembering

work-like procedures or have difficulty understanding and remembering very short and

simple instructions, as well as detailed instructions."  (Tr. 457-458.)  Dr. Morse also

found that Plaintiff could carry out very short and simple, as well as detailed, instructions

but that he would have "minor difficulty sustaining an ordinary routine, performing at a

consistent pace, making simple work-related decisions, and completing a normal

workday without some interruptions from his mental health symptoms."  (Tr. 458.)

With regard to Plaintiff's social functioning, Dr. Morse concluded as follows:

> The claimant related adequately to the evaluator but reported significant
> difficulty in his interpersonal relationships.  There was evidence of legal
> difficulties related to inappropriate interactions with women.

> There was evidence to suggest that the claimant has great difficulty
> interacting appropriately with the general public.  He would have difficulty
> asking simple questions, requesting assistance, and responding
> appropriately to criticism from supervisors.  The claimant has difficulty
> getting along with coworkers and acting appropriately in social situations.

He is able to adhere to basic standards of neatness and cleanliness.

(Tr. 458.)  Dr. Morse also concluded Plaintiff "would have some difficulty responding appropriately to changes in the work setting, setting realistic goals, making plans independently of others, or engaging in activities independent of supervision or direction."  (*Id.*)  Finally, Dr. Morse found Plaintiff "experiences difficulty interacting appropriately in social situations and difficulty getting along with coworkers and supervisors," and noted that "his symptoms have not been alleviated by increased treatment or a less stressful situation."  (*Id.*)

On March 19, 2012, state agency psychologist Bruce Goldsmith, Ph.D., reviewed Plaintiff's medical records and completed a psychiatric review technique and mental residual functional capacity ("RFC") assessment.   (Tr. 95-98.)  He found Plaintiff was mildly restricted in his activities of daily living; moderately restricted in social functioning; and moderately restricted in maintaining concentration, persistence, or pace.  (Tr. 95.)  In his RFC assessment, Dr. Goldsmith further concluded Plaintiff was moderately limited in his abilities to: (1) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (2) interact appropriately with the general public; (3) accept instructions and respond appropriately to criticism from supervisors; (4) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (5) respond appropriately to changes in the work setting.  (Tr. 97-98.)

In the narrative portion of this assessment, Dr. Goldsmith stated Plaintiff was limited to "simple to moderately complex tasks that are not fast paced or have strict

14

production demands" and "routine tasks in an environment with infrequent changes."

(Tr. 98.)  He also stated that:

> Clmt reports not getting along well with others, particularly women, and being socially avoidant.  However, clmt continues to go about routine daily interactions necessary to manage daily affairs.  Clmt is capable of performing work that does not involve frequent social interactions with customers or co-workers.  Claimant is able to engage appropriately in simple social interactions necessary in a workplace that do not require resolving conflicts or supervising others.

(*Id.*)

Thereafter, on August 10, 2012, state agency psychologist Carl Tishler, Ph.D., reviewed Plaintiff's medical records and completed a psychiatric review technique and Mental RFC Assessment.  (Tr. 119-122.)  Dr. Tishler reached the same conclusions as Dr. Goldsmith regarding Plaintiff's mental functional limitations.  (*Id.*)

### 3.    Third Party Statements

Plaintiff's father, mother, sister, and brother-in-law each submitted third-party statements to the ALJ regarding Plaintiff's mental health symptoms.  (Tr. 356-359, 361, 363-365, 375.)  Of particular relevance, these statements provide as follows:

- "Several times during each of the past decade, [Plaintiff] has suffered from episodes of paranoia accompanied by bizarre/delusional ideation."  (*Id.*)

- While training to be become a trucker, Plaintiff "became convinced that the instructor was planning to murder him with a gun mounted on a rack in the truck."  (*Id.*)  He lost another job under similar circumstances "because he believed the owner . . was going to shoot him with a rifle." (*Id.*)

- "In the many jobs he has had temporarily over the years, [Plaintiff] has frequently developed the belief that his co-workers are gossiping and conspiring against him, lying about him to undermine him, and attempting to get him fired.  This often leads to hostile confrontations between him, his fellow employees and, in many cases, his supervisor."  (Tr. 357.)

- Plaintiff insulted customers and made inappropriate racial comments at a

15

job at Speedway.  He has been fired from at least three jobs "for making inappropriate, disquieting, and bizarre comments to women that he works with."  (Tr. 357.)

• Plaintiff began attending church and attending bible studies at the pastor's home.  His "comments and behavior during the discussions frightened the pastor's wife so much so that the pastor asked him to leave the bible study and discontinue attending the church."  (*Id.*)

• "Sometimes when he is in the grip of his disorder, [Plaintiff's] delusions are accompanied by hallucinations."  (Tr. 358.)  He reported seeing angels, ghosts, and UFOs.  (*Id.*)  He has "destroyed property . . .while in his manic phase, such as when he dismantled all of the clocks around my parent's house."  (*Id.*)

• Plaintiff is unable to manage money and engages in manic, compulsive buying.  (Tr. 358.)  He is unable to handle stressful situations and begins "physically shaking and . . . is unable think rationally."  (Tr. 359.)

• Plaintiff "may be incapable of successfully living unsupervised on his own," and needs to be in a "more secure living situation where he can be monitored."  (*Id.*)

• "When [Plaintiff] is in the grip of his disordered thinking and behavior, he says and does inappropriate and bizarre things without any apparent consciousness or comprehension for the potential consequences of his actions."  (Tr. 361.)  "These patterns of behavior have also typically resulted in loss of his job whenever he's found regular employment. . . Frequently, after a week or so of new employment, his inability to interact appropriately with coworkers and customers begins to negatively impact his relationships and performance at the job site, then he begins thinking and acting in a paranoid way."  (*Id.*)  He has been dismissed from nine jobs in the past year alone.  (*Id.*)

• Plaintiff's "erratic behavior, inability to get along with people, and paranoia make it impossible for him to keep a job for more than a few weeks.  He has had jobs ranging from heavy interaction with the public to no public interaction and the outcome is consistent . . . terminated."  (Tr. 375.)

**C.    Hearing Testimony**

**1.    Plaintiff's Hearing Testimony**

16

During the November 15, 2013 hearing, Plaintiff testified to the following[7]:

- He finished the 12th grade and had some vocational training regarding computers.  (Tr. 63-64.)  He has been married for over 19 years but is no longer living with his wife.  He has no children and lives alone in a mobile home park.  (Tr. 62.)

- He has a driver's license.  His truck was "broken down" as of the date of the hearing, but generally he drives five to six days per week.  (Tr.  62.)

- He was diagnosed as bipolar when he was 15 years old.  (Tr. 71.)  He has been on different medications for this condition for the past 33 years.  (*Id.*)  He currently takes Geodon, Oxcarbazepine, Lorazepam, and Depakote.  (Tr. 70.)  He used to take Fanapt, but discontinued that medication after experiencing severe side effects.  (Tr. 72.)  He sees a therapist every month and a doctor once every two to three months.  (Tr. 76.)

- He has diabetes and high cholesterol.  By watching his diet and exercising, he lost 110 to 120 pounds in the last year and a half.  He is no longer taking medication for his diabetes, but he does take simvastatin for high cholesterol.  (Tr. 71-72.)

- He has past work at a dairy mart and an Autozone.  In these jobs, he cleaned, worked the cash register, delivered parts, and answered phones.  He also had customer service and sales responsibilities.  (Tr. 64-65.)  Between 2007 and 2009, he worked as a pizza delivery person.  (Tr. 65.)

- He has had several different jobs since he separated from his wife.  However, he explained that "it's a matter of time before the bullying starts and people get – you know, the first couple weeks of any job is all nice and dandy, but after that it's like I pay attention to what I'm supposed to do and keep my mind on the work I'm doing and the job I have, but I've had a lot of people, when I start laughing or being, you know, happy or in a good mood, try to put me in a bad mood."  (Tr. 66.)

- He has been fired from jobs five or six times for "insubordination, walking out and not going back, being accused of doing things I didn't do, some things I did, some things I didn't." (Tr. 76.)  He has walked out on jobs because "I couldn't handle the stress, the different people, the work."  (*Id.*)  It is difficult for him to take orders from people under 25 years of age.  (Tr. 74.)  He feels that he deserves more than he gets paid.  (Tr. 73.)

---

[7] Due to Plaintiff's "past inappropriate behavioral actions at a Social Security field office," a guard was present in the room during the hearing.  (Tr. 33.)

- The last time he worked full time was in 2009/2010.  (Tr. 68.)  When he's not working, he enjoys listening to music, taking walks, and riding his bike.  (*Id.*)  He likes to cook and does his own laundry.  (*Id.*)  He goes to the grocery store and gas station, and socializes with a few people "once in awhile."  (Tr. 75.)

### 2.  Vocational Expert's Hearing Testimony

The VE testified Plaintiff had past relevant work as a cashier (DOT 211.462-014)(performed as medium, semi-skilled, SVP 3); salesperson, parts (DOT 279.357-062)(performed as medium, skilled, SVP 5); and merchandise deliverer (DOT 299.477-010) (medium, unskilled, SVP 2).  (Tr. 81.)  The ALJ then posed the following hypothetical:

> [F]or the first hypothetical, please assume a hypothetical individual of the claimant's age and education, with the past relevant work as described.  The individual could perform work at all exertional levels as those levels are defined in the Dictionary of Occupational Titles and retains the ability to perform work involving simple to moderately complex tasks that are not fast-paced or have strict production demands.  The individual is capable of superficial interaction with co-workers, supervisors and the public that do not require resolving conflicts or supervising others in a static environment with infrequent changes.  And the individual retains the ability to make simple workplace decisions or work-related decisions.  And let me ask this question, I want to make– or maybe I'll say it– let me rephrase just the last part.  I'll say there are – they can make appropriate work-related decisions within the confines of this RFC.

(Tr. 83.)

The VE testified such an individual could perform Plaintiff's past relevant work as a cashier, salesperson, and merchandise deliverer, and could also perform other jobs in the national and regional economy such as cook helper (DOT 317.687-010)(medium, unskilled, SVP 2), industrial cleaner (DOT 381.687-018) (medium, unskilled, SVP 2), and hand packager (DPT 920.587-018) (medium, unskilled, SVP 2).  (Tr. 83-84.)

18

The ALJ then asked the following question:

Q:    Okay.  How does the ability to work with others affect the ability to sustain competitive employment?  Like, for example, if an individual had difficulty even maintaining superficial interactions, how would that affect their ability to maintain competitive employment?

A:    I think that it would eliminate many jobs if you cannot have at least superficial interaction with the co-workers.  There are some jobs that are more isolated than others, such as a cleaning position.  The hand packaging position, you are generally working alone, but there are people in the area.  However, if you cannot either follow directions or relate appropriately, it could eliminate all employment.

(Tr. 84-85.)  The ALJ then asked the VE to explain the "normal time requirement to be on-task during the workday," and the "standard tolerance for absences."  (Tr. 85.)  The VE testified that 80 percent on-task behavior allows for productive work.  (*Id.*)  With regard to absences, the VE stated that employer tolerance is "between one-half to one day a month and the one day a month would be on the high end of acceptable."  (Tr. 85-86.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott*

19

*v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2. The claimant has not engaged in substantial gainful activity since September 28, 2011, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. The claimant has the following severe impairments: bipolar disorder; adjustment disorder; and anti-social personality disorder (20 CFR

20

404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant retains the ability to perform simple to moderately complex tasks that are not fast paced or have strict product demands; the claimant is capable of superficial interactions with coworkers, supervisors, and the public that do not require resolving conflicts or supervising others in a static environment with infrequent changes; and the claimant is able to make simple work-related decisions.

6.   The claimant is capable of performing past relevant work as a Cashier, Sales Person, and Merchandise Deliverer.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.   The claimant has not been under a disability, as defined in the Social Security Act, from September 28, 2011, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 33-44.)

## V.   LAW & ANALYSIS

### A.   Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court

21

does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

### B.    Plaintiff's Assignments of Error

#### 1.    Whether the ALJ properly analyzed the opinions of Drs. Goldsmith and Morse

Plaintiff asserts the RFC is not supported by substantial evidence because, although "the ALJ claimed to give great weight to the opinion of the State agency reviewing psychologist and to the opinion of Dr. Morse," these opinions describe greater limitations on Plaintiff's ability to work.  (Doc. No. 12 at 19.)  In particular, Plaintiff argues the RFC fails to address or include Dr. Goldsmith's opinion that Plaintiff could not engage in frequent social interactions with customers or co-workers.  Plaintiff also asserts the RFC is inconsistent with Dr. Morse's opinion that Plaintiff has "great difficulty" interacting appropriately with the general public.  Plaintiff maintains the ALJ understated these physicians' opinions regarding his ability to interact with others and,

further, failed to address the discrepancy between these opinions and the RFC.

The Commissioner argues that "this is not a case where the ALJ ignored Plaintiff's limitations regarding his ability to interact with others."  (Doc. No. 15 at 11.) She asserts the ALJ properly considered Drs. Goldsmith and Morse's opinions and "reasonably concluded that Plaintiff was capable of working as long as it only required 'superficial' interactions with co-workers, supervisors, and the public that did not require resolving conflicts or supervising others."  (*Id.*)  Moreover, the Commissioner maintains that "even if the ALJ did not properly account for the 'frequency' of social interactions as Plaintiff alleges, this should be considered harmless error" because the VE testified that "there were some jobs that were more isolated than others."  (*Id.* at 12.)

RFC is an indication of a claimant's work-related abilities despite his limitations. *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 416.945(e).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.945(a), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.  While RFC is for the ALJ to determine, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

In formulating the RFC, ALJs "are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists."  20 C.F.R. § 404.1527(e)(2)(i).  Nonetheless, because "State agency medical and psychological consultants and other program physicians, psychologists,

and other medical specialists are highly qualified physicians, psychologists," ALJs must consider their findings and opinions.  (*Id.*)  When doing so, an ALJ "will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions."  20 C.F.R. § 404.1527(e)(2)(ii).  Finally, an ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist" unless a treating physician's opinion has been accorded controlling weight.  (*Id.*)

Here, the ALJ recounted Plaintiff's hearing testimony that he is "unable to work because he has had many conflicts while at past jobs" and is "unable to handle the stress of work due to his mental conditions of bipolar disorder."  (Tr. 39.)  The ALJ's entire discussion of the objective medical evidence is set forth in just one paragraph, as follows:

> Turning to the objective medical evidence, the claimant's record reflects that he has been diagnosed with the mental impairments of bipolar disorder; adjustment disorder; and anti-social personality disorder traits. (4F).  His record supports that for these conditions, throughout the adjudicated period, he has engaged in outpatient mental health services. (3F, 6F, 8F, and 9F).  These services have included case management services, individual therapy sessions, and medical somatic treatment. (Id.)  His treatment notes note that throughout this period his mood and affect have changed and that he has exhibited a range of behaviors, including hypomanic, paranoid, and depressive thinking. (3F/24, 4F, and 8F/10/17).  It also noted that he had at least one incident where he was charged with sexual harassment against a stranger for alleged inappropriate comments. (8F/39).  However, his record also indicates that throughout the adjudicated period he has had good grooming, intact thought process, coherent speech, and stable mood.  (4F and 6F/10/14/19).  Further, he

24

has consistently reported to be doing well.  (6F/10/14/19/24 and 8F/12). In addition, despite his reported past history, the record supports that throughout the adjudicated period he has not required intensive mental health services, including hospitalizations or inpatient treatment.  Further, the record supports that despite his alleged severe symptoms, he has continued to maintain a driver's license without restrictions, an independent household, and has continued to work at several part-time jobs throughout the adjudicated period.  (4F and by testimony).

(Tr. 39-40.)

The ALJ then weighed the opinion evidence.  She assigned great weight to the opinions of Drs. Goldsmith and Tishler, explaining as follows:

Turning to the opinion evidence, the State agency psychological consultants provided opinions on initial review and reconsideration and the undersigned gives their findings and conclusions great weight. (3A, 4A, 5A, and 6A).  These physicians opined that the claimant has limits from bipolar disorder, which include mild limits in activities of daily living, moderate limits in social functioning, moderate limits in concentration, persistence or pace, and no episodes of decompensation of extended duration.  They further opined that the claimant is limited to simple to moderately complex tasks that are not fast paced or have strict production demands and is limited to work that does not involve frequent social interactions with customers or coworkers.  They further noted that the claimant is able to engage appropriately in simple social interactions necessary in a workplace that do not require resolving conflicts or supervising others and that he is limited to routine tasks in an environment with infrequent changes.  Their opinions are internally consistent with the conservative objective mental health treatment of record and with the findings of the consultative examiner (4F).  For these reasons, their findings are assessed great weight.

With regard to consultative examiner Dr. Morse, the ALJ first noted that Dr. Morse assessed a GAF of 55 indicating moderate symptoms, and then discussed Dr. Morse's mental status examination findings.  The ALJ addressed Dr. Morse's opinions regarding Plaintiff's mental health functional limitations as follows:

Dr. Morse opined that the claimant would not have difficulty remembering work-like procedures or have difficulty understanding and remembering very short and simple instructions, as well as detailed instructions.  He

25

further opined that the claimant would have only minor difficulty sustaining an ordinary routine, performing at a consistent pace, making simple work-related decisions, and completing a normal workday without some interruptions from his mental health symptoms.  However, he did indicate that there was evidence to suggest that the claimant has great difficulty interacting appropriately with the general public and that there was evidence to suggest that the claimant would have some difficulty responding appropriately to changes in the work setting, setting realistic goals, making plans independently of others, or engaging in activities independent of supervision or direction.  Dr. Morse's opinion is consistent with his assessed GAF score, which indicates moderate mental health symptoms, and is consistent with the findings of his objective mental status examination noted above.  Further, his findings are consistent with the claimant's conservative mental health treatment of record and with the opinions of the State agency psychological consultants.  For these reasons, Dr. Morse's opinion and GAF score are assessed great weight.

(Tr. 40-41.)

The ALJ then found Plaintiff has the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: "the claimant retains the ability to perform simple to moderately complex tasks that are not fast paced or have strict product demands; the claimant is capable of superficial interactions with coworkers, supervisors, and the public that do not require resolving conflicts or supervising others in an static environment with infrequent changes; and the claimant is able to make simple work-related decisions."  (Tr. 38.)

The Court finds the ALJ failed to adequately address the social limitations set forth in Dr. Goldsmith's and Dr. Tischler's opinions.  Both psychologists specifically opined that Plaintiff is "capable of performing work that does not involve *frequent* social interactions with customers or co-workers."  (Tr. 98, 122) (emphasis added).  Purporting to according "great weight" to these opinions, the ALJ included in both the hypothetical posed to the VE and the RFC a limitation to "*superficial* interactions with coworkers,

26

supervisors and the public."  (Tr. 38, 83.)  Plaintiff argues, however, and the Court agrees, that the limitation to superficial interactions does not adequately address the state agency psychologists' specific limitations to "work that does not involve frequent[8] social interactions."

The ALJ does not address this issue in the decision and it is not clear from the hearing transcript whether either the ALJ or the VE interpreted the limitation to "superficial" social interactions to encompass both their nature and frequency.[9]  This is potentially significant given the jobs identified by the VE and the ALJ's Step 5 findings. For example, the VE testified (and the ALJ found in her decision) that Plaintiff could perform his past relevant work of cashier and salesperson.  (Tr.  83-84.)  While social interactions in these positions may be superficial in terms of the nature of each individual interaction itself, it is not unreasonable to believe there may be many such "superficial"

---

[8] "'Frequent' is a term of art in Social Security disability cases that means "occurring from one-third to two-thirds of the time." *Muniz v. Astrue*, 2012 WL 314094 at * 6 (N.D. Ohio) (White, M.J.) )(citing *Jones v. Astrue*, 2011 WL 1343896 (W.D. Ky. March 22, 2011) and Social Security Ruling 83-10, 1983 WL 31251 at * 6 (1983)).

[9] While neither party cites any law on this issue, cases have noted the distinction between the quality of social interactions (i.e., superficial, does not resolve conflicts or supervising others) and the frequency of interactions (i.e., frequent, occasional, none.)  *See e.g. Gonzalez v. Colvin*, 2014 WL 1333713 at * 9 (N.D. Ohio March 28, 2014) (Vecchiarelli, M.J.) (where state agency psychologists limited Plaintiff to "occasional superficial interactions," finding "the record supports Plaintiff's contention that the ALJ erred by failing to incorporate restrictions related to the *frequency and intensity* of Plaintiff's social interactions into the RFC determination") (emphasis added); *Hill v. Colvin*, 2015 WL 8752361 at * 5 (N.D. Ind. Dec. 14, 2015) (remanding because "the ALJ limited only the Plaintiff's frequency of interactions with supervisors and coworkers but did not address the intensity of such interactions").

interactions during the course of an eight hour workday.  The ALJ does not acknowledge or address this issue at any point in her decision.

The ALJ's failure to do so is not harmless error given Plaintiff's well-documented history of social functioning impairment.  As set forth in detail above, the medical record contains ample evidence regarding Plaintiff's struggles with social interactions, including numerous treatment notes documenting instances of inappropriate behavior towards the general public, neighbors, and family members.  (Tr. 537, 532, 525, 522, 561, 568.)  Several documents in the record relate specifically to the negative impact of Plaintiff's social limitations on his ability to sustain employment.  (Tr. 432, 568, 563, 559, 555.)  Indeed, in addition to Mr. Wolford's, Ms. Laird's and Mr. Nimrichter's treatment notes, statements submitted by Plaintiff's family members to the ALJ document numerous instances of job losses due to Plaintiff's inappropriate social behavior.  *See e.g.* Tr. 368 (Plaintiff "insulted customers and made inappropriate racial comments about them" and "lost at least three jobs . . . for making inappropriate, disquieting, and bizarre comments to women that he works with.")  Further, the VE expressly testified that "if you cannot either follow directions or relate appropriately, it could eliminate all employment."  (Tr. 85.)

In light of the above, the Court finds the ALJ erred in failing to specifically address Drs. Goldsmith and Tishler's opinions that Plaintiff is "capable of performing work that does not involve frequent social interactions with customers or co-workers."  (Tr. 98, 122.)  Accordingly, on remand, the ALJ should consider these psychologists' opinions with respect to this issue and clearly explain her decision to either adopt or not adopt their opinions.  If the ALJ does adopt the limitation that Plaintiff is capable of performing

work that does not involve frequent social interactions with customers or co-workers, the ALJ should obtain additional evidence to determine whether an individual with such limitation would be precluded from working in jobs available in the national economy.

As this matter is being remanded for further consideration of the opinions of Drs. Goldsmith and Tischler, the ALJ should also give greater consideration on remand to Dr. Morse's opinion that Plaintiff has "great difficulty interacting appropriately with the general public."  The ALJ purports to give this opinion "great weight" but does not clearly explain how it is consistent with the RFC's limitation to "superficial interactions with . . . the public that do not involve resolving conflicts or supervising others in a static environment with infrequent changes."  On remand, the ALJ should explain her analysis of Dr. Morse's opinion on this issue in greater detail.

### 2. Whether the ALJ erred in failing to address Dr. Bishop's GAF rating and Ms. Laird's treatment notes.

#### a. GAF score

Plaintiff argues the ALJ improperly failed to address Dr. Bishop's February 2012 assessment of a GAF score of 40.  Plaintiff asserts the Social Security Administration considers GAF scores "opinion evidence" and, therefore, the ALJ was required to provide "good reasons for the weight provided to the GAF score."  (Doc. No. 12 at 17.) Plaintiff claims remand is required because the ALJ "makes no mention of the GAF score from Dr. Bishop, let alone provide any analysis of the weight to give it."  (*Id.* at 16.)

The Commissioner acknowledges "the ALJ did not specifically address all the GAF ratings," but argues the failure to do so constitutes harmless error.  She asserts Dr. Bishop did not provide support for "such extreme GAF scores" and argues "other mental

status examination findings did not support such an extreme score where they consistently demonstrated that Plaintiff had intact thought process, stable mood; coherent speech; bright overall affect; euphoric, stable mood; and cooperative, pleasant behavior."  (Doc. No. 15 at 14.)

The Sixth Circuit takes a "case-by-case approach to the value of GAF scores." *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 836 (6th Cir. 2016).  As that court recently explained:

> A GAF score is a "subjective rating of an individual's overall psychological functioning," which may assist an ALJ in assessing a claimant's mental RFC.  *Kennedy v. Astrue*, 247 Fed. Appx. 761, 766 (6th Cir. 2007).  GAF scores are "not raw medical data," *id.*, and "the Commissioner has declined to endorse the [GAF] score for use in" Social Security benefits programs, *Lee v. Comm'r of Soc. Sec.*, 529 Fed. Appx. 706, 716 (6th Cir. 2013) (quoting *DeBoard v. Comm'r of Soc. Sec.*, 211 Fed. Appx. 411 (6th Cir. 2006)).

*Id.* at 835-836.  *See also Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 511 (6th Cir. Feb. 9, 2006) (stating that "we are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF store in the first place." )

While the Sixth Circuit has held that a GAF score is "not essential to the RFC's accuracy," that court has noted that a GAF score "may be of considerable help to the ALJ in formulating the RFC."  *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002).  ALJs are not, however, required to place any "particular amount of weight" on a GAF score.  *Johnson v. Comm'r of Soc. Sec.*, 535 Fed. Appx. 498, 508 (6th Cir. Oct. 15, 2013).  *See also Howard*, 276 F.3d at 241 (noting that a GAF "is not essential to the RFC's accuracy"); *Keeler v. Comm'r of Soc. Sec.*, 511 Fed. Appx. 472, 474 (6th Cir. Jan. 11, 2013) (stating that "the ALJ was not required to consider Keeler's GAF score").

Indeed, the Sixth Circuit has "held that the failure to reference a [GAF] score is not, standing alone, sufficient ground to reverse a disability determination." *DeBoard*, 211 Fed. Appx. at 415 (citing *Howard*, 276 F.3d at 241).

Plaintiff, however, argues that administrative guidance from the Social Security Administration ("SSA") requires ALJs to consider GAF scores as "opinion" evidence. Specifically, Plaintiff cites an SSA administrative message issued in July 2013 (six months before the ALJ decision),which states (in relevant part) as follows:

> For purposes of the Social Security disability programs, when it comes from an acceptable medical source, a GAF rating is a medical opinion as defined in 20 CFR §§ 404.1527(a)(2) and 416.927(a)(2).  **An adjudicator considers a GAF score with all of the relevant evidence in the case file and weighs a GAF rating as required by §§ 20 CFR 404.1527(cc), 416.927(cc), and SSR 06-03p**, while keeping the following in mind:

> The GAF is unlike most other opinion evidence we evaluate because it is a rating.  However, as with other opinion evidence, a GAF needs supporting evidence to be given much weight.  By itself, the GAF cannot be used to 'raise' or 'lower' someone's level of function.  The GAF is only a snapshot opinion about the level of functioning.  Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.

> A GAF score is never dispositive of impairment severity.  **DO NOT:**

>> • **Give controlling weight to a GAF from a treating source unless it is well supported and not inconsistent with the other evidence.**

>> **When case evidence includes a GAF from a treating source and you do not give it controlling weight, you must provide good reasons in the personalized disability explanation or decision notice.**

SSA, Global Assessment of Functioning (GAF) Evidence in Disability Adjudication, AM-13066 (July 22, 2013) (emphasis added).

31

Nine months after the ALJ's decision, the SSA issued a revised version of AM-13066 ("AM-13066 REV.")  That document acknowledges that the American Psychiatric Association ("APA") published a fifth edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM") on June 1, 2013 "that does not include GAF rating for assessment of mental disorders."  The SSA stated, however, that "we continue to receive and consider GAF in medical evidence."  SSA, GAF Evidence in Disability Adjudication -REV, AM-13066 REV (October 14, 2014).  It reiterates that ALJs should weigh a GAF rating as required by §§ 20 CFR 404.1527(c), 416.927(c), and SSR 06-03p.  Additionally, AM-13066 REV states that "when case evidence includes a GAF rating from a treating source, adjudicators must consider the GAF rating and the treating source's support for assigning that specific rating, along with all of the relevant evidence in the case file, and provide good reasons in the personalized disability explanation or decision notice why you assigned it the weight you assigned."  *Id.* at 3.

The SSA's directives in AM-13066 and AM-13066 REV that ALJs must provide "good reasons" for the weight assigned to a GAF score from a treating source, appear to potentially conflict with Sixth Circuit case law that ALJs are not required to consider GAF scores, *Keeler* 511 Fed. Appx. at 474, and "the failure to reference a [GAF] score is not, standing alone, sufficient ground to reverse a disability determination."  *DeBoard*, 211 Fed. Appx. at 415 (citing *Howard*, 276 F.3d at 241).  Neither party to the instant case addresses this potential conflict.  Nor do the parties direct this Court's attention to any case law regarding the weight to be given SSA administrative messages in federal proceedings.  District Courts in this Circuit have acknowledged AM-13066 and AM-13066 REV.  In many of these cases, however, remand was not required because the

32

ALJs in those cases did, in fact, acknowledge and provide reasons for discounting the GAF scores at issue.  *See e.g., Myers v. Comm'r of Soc. Sec.*, 2015 WL 9906165 at ** 5-7 (E.D. Tenn. Dec. 30, 2015); *Bryce v. Comm'r of Soc. Sec.*, 2014 WL 1328277 at * 9-10 (E.D. Mich. March 28, 2014); *Bruner v. Comm'r of Soc. Sec.*, 2016 WL 1056086 at * 4 (E.D. Mich. March 17, 2016); *Brannon v. Colvin*, 2015 WL 4479708 at * 4 (M.D. Tenn. July 21, 2015).

Here, by contrast, the ALJ does not mention or address Dr. Bishop's February 2012 GAF score of 40 at any point in the decision.  Indeed, the ALJ does not expressly reference Dr. Bishop at all, nor does she provide any meaningful review of his treatment notes.  Dr. Bishop saw Plaintiff on at least (7) occasions in 2012 and 2013.  (Tr. 495-496, 486, 489, 515, 508, 574, 561-562.)  During these visits, Dr. Bishop often noted concerning mental health symptoms, including circumstantial thoughts, inappropriate affect, paranoid ideation, auditory hallucinations, and decreased insight and judgment. (*Id.*)  The ALJ decision simply fails to address or meaningfully evaluate this evidence.

As the instant case is being remanded on other grounds, the Court need not decide whether the ALJ was required, as a matter of law, to explicitly weigh Dr. Bishop's GAF score and provide "good reasons" for discounting it.  On remand, however, the ALJ should provide an analysis of Plaintiff's treatment history with Dr. Bishop, including a discussion of Dr. Bishop's assessment of a GAF score of 40.

### b.    Ms. Laird

Plaintiff next argues the ALJ erred in failing to mention or evaluate Ms. Laird's July 24, 2012 opinion that Plaintiff has "poor insight about how to adequately cope with and manage mental health symptoms."  (Doc. No. 12 at 17.)  Although acknowledging that

33

Ms. Laird is not an "acceptable medical source," Plaintiff asserts the ALJ was nonetheless required to evaluate the content of this opinion and that her failure to do so constitutes reversible error.

The Commissioner acknowledges the ALJ failed to address Ms. Laird's opinion but argues such failure is harmless error.  She maintains it "would not impact the outcome of this case" because it does not provide any specific restrictions on Plaintiff's ability to perform work-related activities.  (*Id.* at 15.)

Under Social Security regulations, only "acceptable medical sources" are considered "treating sources" whose opinions may be entitled to controlling weight.  *See* 20 CFR §§ 404.1502/416.902, 404.1513(d)/416.913(d), and 404.1527(d)/416.927(d); Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939 at * 2 (Aug. 9, 2006).  Here, Plaintiff acknowledges that Ms. Laird, a "professional counselor," is not an "acceptable medical source" under the regulations.  (Doc. No. 12 at 17.)  Rather, the parties agree that Ms. Laird is an "other source" pursuant to 20 CFR §§ 404.1513(d)(1)/416.913(d)(1), which is neither entitled to controlling weight nor subject to the "good reasons" requirement of the treating physician rule.  *See* SSR 06-03p, 2006 WL 2329939 at * 2; *Everett v. Comm'r of Soc. Sec.*, 2012 WL 3731388 at * 11 (S.D. Ohio Aug. 28, 2012).

Nonetheless, evidence from "other sources" should not be ignored.  As explained in SSR 06-03p, information from "other sources" is "important" and "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  SSR 06-03P, 2006 WL 2329939 at * 2 -3 (Aug. 9, 2006).  Interpreting this SSR, the Sixth Circuit has found that opinions from "other sources" who have seen the claimant in their professional capacity "should be evaluated using the applicable factors,

including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir.  2007) ("Following SSR 06-03P, the ALJ should have discussed the factors relating to his treatment of Hasselle's assessment, so as to have provided some basis for why he was rejecting the opinion").  *See also McKitrick v. Comm'r of Soc. Sec.*, 2011 WL 6939330 at * 12-13 (N.D. Ohio Dec. 30, 2011) (Armstrong, M.J.); *Kerlin v. Astrue*, 2010 WL 3937423 at * 7 (S.D. Ohio March 25, 2010).

Here, Ms. Laird saw Plaintiff on at least seven (7) occasions between August 2011 and July 2012.  (Tr. 443, 445, 447, 449, 532, 527-528, 513.)  During this time period, Ms. Laird documented numerous troubling mental health symptoms, including "bizarre and delusional paranoid thought processes," grandiosity, hypomanic behaviors, psychomotor activity, labile affect, poor hygiene, tangential and derailed thoughts, erratic conversation, and pressured/inappropriate laughter.  (*Id.*)  She completed a Daily Activities Questionnaire regarding Plaintiff on July 24, 2012.  (Tr. 478-479.)  She found Plaintiff had "poor insight about how to adequately cope with and manage mental health symptoms," and had shown "a pattern of not being aware of symptomatology especially when manic."  (Tr. 478.)  Ms. Laird also noted Plaintiff was independent in the areas of food preparation, household chores, personal hygiene, shopping, and driving, but entirely dependent on his family for banking and bill paying.  (Tr. 479.)

The ALJ does not mention nor address Ms. Laird's opinion at any point in the decision.  Similar to her treatment of Dr. Bishop, the ALJ does not expressly reference Ms. Laird at all, nor does she provide any meaningful review of her treatment notes.  While Ms. Laird's opinion does not set forth any specific functional limitations, the ALJ

should have acknowledged the opinion and addressed it in some fashion.  In addition to addressing the other issues identified in this Memorandum Opinion & Order, the ALJ is instructed on remand to provide an analysis of Plaintiff's treatment history with Ms. Laird, including a discussion of her July 24, 2012 opinion.

### 3.  Whether the ALJ failed to properly address the third party statements submitted by Plaintiff's family members.

In his final assignment of error, Plaintiff argues the ALJ failed to adequately analyze the third-party statements submitted by Plaintiff's family members.  (Doc. No. 12 at 23.)  He asserts the "failure to describe the family statements with any specificity undermines the conclusions concerning residual functional capacity."  (*Id.*)

The Commissioner maintains that, "although the ALJ may not have specifically discussed the third-party statements in detail in her decision, this does not mean she committed reversible error because these non-medical source statements would not impact the outcome of the case."  (Doc. No. 15 at 16.)

As noted above, Plaintiff's father, mother, sister, and brother-in-law each submitted third-party statements to the ALJ regarding Plaintiff's mental health symptoms.  (Tr. 356-359, 361, 363-365, 375.)  These statements contain detailed information regarding Plaintiff's symptoms and behavior, as well as numerous examples of his "disorganized thinking and behavior."  (Tr. 356.)  The ALJ acknowledged these statements and addressed them in the decision as follows:

> The claimant's family also submitted several third-party statements into the record.  (14E, 16E, 17E, and 21E).  Each of these statements has been read and considered under the criteria of SSR 06-3p in the decision herein.  Specifically, consideration is given to the reports regarding the claimant's past difficulties maintaining employment, his past inappropriate behavior with others, and his inability to maintain his own finances.  (Id.)

36

> However, despite the concern noted, the claimant has continued to live independently and has continued to maintain his personal tasks independently.  Further, the opinions of State agency psychological consultants, and the conservative mental health treatment of record, fail to support the level of severity of the third party statements.

(Tr. 41.)

The Court cannot say that the ALJ erred in her treatment of the third party statements.  While she did not discuss the opinions at length in the hearing decision, she did include them as exhibits in the record and acknowledged that she considered them. SSR 06–03p explains that when considering evidence from non-medical sources who have not seen the claimant in a professional capacity, the ALJ should "consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." SSR 06–03P, 2006 WL 2329939 (Aug. 9, 2006 ).  There is no requirement that the ALJ discuss the statements in great detail or offer good reasons for rejecting them.  Here, the ALJ noted that she considered the statements but assigned them limited weight in light of Plaintiff's ability to live independently and the "conservative mental health treatment of record."  (Tr. 41.)  The ALJ's explanation is sufficient to satisfy the regulations.

This assignment of error is without merit.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED and the case REMANDED for further proceedings consistent with this Opinion.

**IT IS SO ORDERED**.


s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: May 3, 2016